IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| In re: | : | Case No. 12-37545 |
| | : | |
| AmeriSciences, L.P., | : | Judge Letitia Z. Paul |
| | : | |
| Debtor. | : | Chapter 11 |
| | : | |
| _____ | : | |
| | : | |
| THOMAS H. GRACE, Chapter 11 Trustee, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Adv. Pro. No. _____ |
| | : | |
| ORGANO GOLD INTERNATIONAL, INC., | : | |
| ORGANO GOLD ENTERPRISES, INC., | : | |
| ORGANO GOLD HOLDINGS, LTD., | : | |
| LOUIS GALLARDO, HOLTON BUGGS, | : | |
| BARRY COCHEU, KARA COCHEU, | : | **COMPLAINT** |
| BLS MANAGEMENT, LP; BHF VENTURES, LP, | : | **AND JURY DEMAND** |
| CSF LEGACY, LP, LBS REAL PROPERTIES, LP, | : | |
| GREG NAKAGAWA, MONICA NAKAGAWA, | : | |
| INSPIRAMED LLC, STEVE FERTIG, | : | |
| JEANNE FERTIG, HEALTHTECH DIRECT, LLC, | : | |
| JEFF GIAMMALVA, LISA GIAMMALVA, | : | |
| GLOBAL WELLNESS GROUP, | : | |
| KENT WASCOVICH, DONNA WASCOVICH, | : | |
| WELLNESS VENTURES, LLC, | : | |
| GRANT SPERRY, LYNN SPERRY, | : | |
| DR. WILLIAM KROOSS, MARIE KROOSS, | : | |
| JOHN DOES 1-5, JOHN DOES 6-10 | : | |
| | : | |
| Defendants. | : | |
| | : | |
| _____ | : | |

1

## COMPLAINT

Now comes Plaintiff, Trustee Thomas H. Grace ("Plaintiff" or "Trustee"), the Chapter 11 trustee for AmeriSciences, L.P., a Texas limited Partnership d/b/a "AmeriSciences" ("AmeriSciences" or "Debtor"), and avers for his Complaint against Organo Gold International, Inc., Organo Gold Enterprises, Inc., Organo Gold Holdings, Ltd., Louis Gallardo, Holton Buggs, Barry Cocheu, Kara Cocheu, BLS Management, LP, BHF Ventures, LP, CSF Legacy, LP, LBS Real Properties, LP, Greg Nakagawa, Monica Nakagawa, Inspiramed LLC, Steve Fertig, Jeanne Fertig, HealthTech Direct, LLC, Jeff Giammalva, Lisa Giammalva, Global Wellness Group, Kent Wascovich, Donna Wascovich, Wellness Ventures, LLC, Grant Sperry, Lynn Sperry, Dr. William Krooss, Marie Krooss, John Does 1-5 and John Does 6-10 (each individually a "Defendant" and collectively the "Defendants") as follows:

## JURISDICTION AND VENUE

1.      The Trustee brings this adversary proceeding pursuant to Bankruptcy Rule 7001 and Sections 542, 544, 547 and 548 of Title 11 of the United States Code, as amended (the "Bankruptcy Code") and the laws of the State of Texas and other states to the extent applicable.

2.      This Court has subject matter jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. § 1334(b).  This Adversary Proceeding relates to the above-captioned bankruptcy case of AmeriSciences, Case No. 12-37545-H3-11 (the "Bankruptcy Case"), which is now pending before this Court.

3.      Venue of this Adversary Proceeding is proper in this Court pursuant to 28 U.S.C. § 1409(a) and General Order of Reference in this District, General Order No. 2012-6.

## PARTIES

4.      Plaintiff, Thomas H. Grace, is the duly-appointed Trustee in the Bankruptcy Case of AmeriSciences.  AmeriSciences operated as a multi-level marketing company that developed, marketed and sold high-quality nutritional supplements to consumers through a vast and valuable network of independent distributors.

5.      Defendant Organo Gold International, Inc. ("OGI") is a Nevada corporation. Upon information and belief, OGI is headquartered at 5505 Hovander Road, Ferndale, Washington 98248.  OGI operates as a multi-level marketing or "network marketing" company that sells products with claimed health benefits (including coffee, tea and "high potency" supplements) to consumers through a tiered network of independent distributors.

6.      Defendant Organo Gold Enterprises, Inc. ("OGE") is, upon information and belief, a Canadian corporation with headquarters at 12148 Horseshoe Way, Richmond B.C. V7A 4V5, Canada.  OGE is believed to be the parent of OGI.

7.      Defendant Organo Gold Holdings, Ltd., ("OGH," and together with OGI and OGE, "Organo Gold") is, on information and belief, a Hong Kong limited liability company with headquarters at Level 28 Three Pacific Place 1 Queen S Rd East Hong Kong.  OGH is believed to be the transferee of one or more of the AmeriSciences Assets (defined below) and an affiliate of OGE.

8.      Defendant Louis Gallardo ("Louis") is an individual believed to be a Texas resident.  Through all relevant periods, Louis was a senior executive officer, principal, control person and substantial equity owner of AmeriSciences and its general partner.  Louis may be served at the address of his residence which is believed to be 324 Duffy Lane, Austin, Texas 78738.

9.      CSF Legacy, LP ("CSF") is a limited partnership that at all relevant times is believed to have been based in Texas and owned, controlled and/or the alter ego of Louis.

10.      John Does 1-5 are one or more entities not currently known to Plaintiff and affiliates and/or insiders of Louis who participated and/or benefited from the events of this Complaint.  John Does 1-5, CSF and Louis are collectively referred to as "Gallardo".

11.      Defendant Holton Buggs ("Holton") is an individual believed to be a Texas resident.  Upon information and belief, at all relevant times, Holton was a top-level/highly compensated Organo Gold distributor and does business as and/or is the alter ego and/or sole proprietor of Organo Gold University ("OGU").   Hereinafter, Holton and OGU will be collectively referred to as "Buggs."   Buggs may be served at the address of his residence which is believed to be 2007 Shadowbriar Drive, Houston, Texas 77077.

12.      Defendant Barry Cocheu ("Barry") is a Texas resident.  Through all relevant periods, Barry was a senior executive officer, principal, control person and substantial equity owner of AmeriSciences and its general partner.  Barry is a Chapter 7 debtor in Case No.  13-34407 (the "Cocheu Bankruptcy Case") now pending before the United States Bankruptcy Court for the Southern District of Texas.  Plaintiff has obtained relief from stay in the Cocheu Bankruptcy Case to pursue the claims alleged in this Complaint.  Barry may be served at the address of his residence which is believed to be 11818 Montmarte Blvd., Houston, TX 77082.

13.      Through all relevant periods, Defendant Kara Cocheu ("Kara") was the spouse of Barry and, upon information and belief, involved in the AmeriSciences business.  Kara is a co-debtor in the Cocheu Bankruptcy Case.  Plaintiff has obtained relief from stay in the Cocheu Bankruptcy Case to pursue the claims alleged in this Complaint.  Kara may be served at the address of her residence which is believed to be 11818 Montmarte Blvd., Houston, TX 77082.

14.      BHF Ventures, LP ("BHF") is a limited partnership that at all relevant times is believed to have been based in Texas and owned, controlled and/or the alter ego of Barry.

15.      John Does 6-10 are entities not currently known to Plaintiff and are are affiliates and/or insiders of Barry and/or Kara who participated and/or benefited from the events of this Complaint.  John Does 6-10, BHF, Barry and Kara are collectively referred to as the "Cocheus".

16.      BLS Management, LP ("BLS") is a limited partnership that at all relevant times is believed to have been based in Texas and owned, controlled and/or the alter ego of Barry, Louis and Steven Redman ("Redman").[1]

17.      LBS Real Properties, LP ("LBS") is a limited partnership that at all relevant times is believed to have been based in Texas and owned, controlled and/or the alter ego of Barry, Louis and Redman.

18.      Defendant Greg Nakagawa is an individual believed to be a Texas resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Greg Nakagawa may be served at the address of his residence which is believed to be 1800 S. Ocean Drive, Apt. 3803S, Hallandale Beach, Florida 33009.

19.      Defendant Monica Nakagawa is an individual believed to be a Texas resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Monica Nakagawa may be served at the address of her residence which is believed to be 1800 S. Ocean Drive, Apt. 3803S, Hallandale Beach, Florida 33009.

20.      Inspiramed LLC is a limited liability company that at all relevant times is believed to have been based in North Carolina and owned, controlled and/or the alter ego of

[1] Together with Barry and Louis, Redman was a senior executive officer, principal, control person and substantial equity owner of AmeriSciences and its general partner.  Since the events at issue in this lawsuit, Redman has received a bankruptcy discharge.

Greg and Monica Nakagawa.  Inspiramed LLC, Greg Nakagawa and Monica Nakagawa are collectively referred to as the "Nakagawas".

21.     Defendant Steve Fertig is an individual believed to be a North Carolina resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Steve Fertig may be served at the following address: P.O. Box 2865, Cashiers, North Carolina 28717-2865.

22.     Defendant Jeanne Fertig is an individual believed to be a North Carolina resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Jeanne Fertig may be served at the following address:  P.O. Box 2865, Cashiers, North Carolina 28717-2865.

23.     HealthTech Direct, LLC is a limited liability company that at all relevant times is believed to have been based in North Carolina and owned, controlled and/or the alter ego of Steve Fertig and/or Jeanne Fertig.   HealthTech Direct, LLC, Steve Fertig and Jeanne Fertig are collectively referred to as the "Fertigs".

24.     Defendant Jeff Giammalva is an individual believed to be a California resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Jeff Giammalva may be served at the address of his residence which is believed to be 15 Sierra Vista, Laguna Niguel, California 92677.

25.     Defendant Lisa Giammalva is an individual believed to be a California resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Lisa Giammalva may be served at the address of her residence which is believed to be 15 Sierra Vista, Laguna Niguel, CA 92677.

26.     Global Wellness Group ("GWG") is a business entity that at all relevant times is believed to have been based in California and owned, controlled and/or the alter ego of Jeff Giammalva and/or Lisa Giammalva.   GWG, Jeff Giammalva and Lisa Giammalva are collectively referred to as the "Giammalvas".

27.     Defendant Kent Wascovich is an individual believed to be a Georgia resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Kent Wascovich may be served at the address of his residence which is believed to be 8815 River Trace Drive, John's Creek, Georgia 30097.

28.     Defendant Donna Wascovich is an individual believed to be a Georgia resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Donna Wascovich may be served at the address of her residence which is believed to be 8815 River Trace Drive, John's Creek, Georgia 30097.

29.     Wellness Ventures, LLC is a business entity that at all relevant times is believed to have been based in North Carolina and owned, controlled and/or the alter ego of Donna Wascovich and/or Kent Wascovich.  Wellness Ventures, LLC, Kent Wascovich and Donna Wascovich are collectively referred to as the "Wascoviches".

30.     Defendant Grant Sperry is an individual believed to be a Texas resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Grant Sperry may be served at the address of his residence which is believed to be 11418 Gallant Ridge Lane, Houston, TX 77082.

31.     Defendant Lynn Sperry is an individual believed to be a Texas resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Lynn Sperry may be served at the address of her residence which is believed to be

7

11418 Gallant Ridge Lane, Houston, TX 77082.  Grant Sperry and Lynn Sperry are collectively referred to as the "Sperrys".

32.     Defendant Dr. William Krooss is an individual believed to be a Mississippi resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  William Krooss may be served at the address of his residence which is believed to be 19 Highland Meadows Drive, Jackson, Mississippi 39236.

33.     Defendant Marie Krooss is an individual believed to be a Mississippi resident that, at all relevant times, either individually or through affiliates or alter egos, was an AmeriSciences distributor.  Marie Krooss may be served at the address of her residence which is believed to be 19 Highland Meadows Drive, Jackson, Mississippi 39236.  Dr. William Krooss and Marie Krooss are collectively referred to as the "Krooses".

## FACTS APPLICABLE TO ALL COUNTS

### Introduction

34.     This lawsuit seeks to remedy the harms brought upon AmeriSciences by the Defendants, particularly in connection with the Defendants' extensively-planned and implemented scheme to steal AmeriSciences' proprietary business methods, distributor information and network, and other valuable assets from AmeriSciences, all of which resulted in the end of AmeriSciences' business operations and the filing of this Bankruptcy Case.

35.     Prior to April 2012, AmeriSciences was an operating multi-level marketing company with a vast network of independent distributors.  In early April of 2012, each of the Defendants acted individually and in concert with others (including soliciting, encouraging and participating in the actions of others) in a manner that assured the destruction of AmeriSciences. The scheme that assured AmeriSciences' demise was hatched in January 2012 (if not earlier)

among Barry, Louis, Organo Gold and Buggs.  In search of greater personal wealth, Barry and Louis sought opportunities outside of their existing roles and duties at AmeriSciences. Following several months of meetings and communications with Buggs and Organo Gold, the parties launched their scheme (now in conjunction with the IMC Defendants (defined below)) whereby:

(1)   Valuable assets, including trade secrets, of AmeriSciences were taken from AmeriSciences without consideration and delivered to Organo Gold and Buggs;

(2)   Barry and Louis, with the assistance and encouragement of the other Defendants, pursued actions that were in disregard and breach of their fiduciary duties to AmeriSciences;

(3)   The IMC Defendants, with the assistance and encouragement of the other Defendants, breached existing contracts with AmeriSciences; and

(4)   Each of the Defendants assisted, encouraged and participated in breaches of contracts with AmeriSciences by other AmeriSciences distributors.

36.    Despite its persistent insolvency in early 2012, AmeriSciences possessed an enviable roster of products and a vast network of independent distributors responsible for product sales.  With faithful and proper leadership from its management team (Barry and Louis), AmeriSciences may have survived its insolvency.  Unfortunately, Barry and Louis were driven by personal greed and the desire to seek personal riches under the compensation structure offered by Organo Gold.  In April of 2012, with the click of a computer mouse, an e-mail delivered AmeriSciences' valuable distributor list to Organo Gold and began the seamless transition of the

AmeriSciences network to Organo Gold.  Each of the Defendants realized or pursued the expectation of substantial personal gain from the scheme and conspiracy.

37.     AmeriSciences, by contrast, saw its most valuable asset disappear without any compensation in return.  AmeriSciences also saw its control persons, executive officers, and distributors walk away from the business, leaving AmeriSciences with no material on-going business operations, no management, minimal assets and a multitude of unpaid liabilities.

38.     AmeriSciences' creditors eventually organized and, on October 4, 2012 (the "Involuntary Petition Date"), certain petitioning creditors filed an involuntary petition against AmeriSciences for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  On November 27, 2012, the court entered an Agreed Order for Relief under Chapter 11 and Appointing Chapter 11 Trustee in the Bankruptcy Case.  On December 5, 2012, this Court approved Plaintiff as Chapter 11 Trustee in the Bankruptcy Case.

**AmeriSciences' MLM Business**

39.     AmeriSciences' predecessor was founded in late 1999 by Louis, Barry and Redman.  The AmeriSciences limited partnership was formed in 2005.  Throughout all relevant time periods, (i) the general partner of AmeriSciences was AMSCI Management, Inc. ("General Partner"), (ii) Barry was President and CEO of AmeriSciences and of General Partner, a director of General Partner, and a substantial equity owner of AmeriSciences and General Partner, and (iii) Louis was one or more of a director, officer and/or controlling person of AmeriSciences[2] and General Partner, a director of General Partner, and a substantial equity owner of AmeriSciences and General Partner.  Louis, Barry and Redman controlled all aspects of AmeriSciences' operations, including all business and financial decisions.  Louis, Barry and Redman collectively owned 100% of General Partner (40%, 40%, and 20%, respectively) and 80.25% of

---

[2] Louis describes his position as "Chairman of AmeriSciences" on his email signature block and other sources.

AmeriSciences (31.14%, 31.14%, and 15.57%, respectively, plus 2.4% owned by General Partner).

40.     AmeriSciences operated as a network marketing or multi-level marketing business ("MLM") whose primary products were nutritional supplements.   As an MLM, AmeriSciences' product sales were effected primarily through its network of independent distributors.  AmeriSciences' distributors were known as "independent marketing consultants" (each, an "IMC" and in combination, the "IMCs").  An IMC would typically purchase products from AmeriSciences for resale to the IMC's customers.  In some instances, an IMC would purchase products for his or her own personal use, and thus an IMC was also generally a customer of AmeriSciences.

41.     AmeriSciences' business revenues and profits were predominantly driven by these product sales.  As an MLM, AmeriSciences' sales volume was dictated and driven by the size and geographic breadth of AmeriSciences' network of IMCs.  This IMC distributor network was quite simply the lifeblood of AmeriSciences and constituted its most valuable asset, as is the case for virtually any MLM business.

42.     At its inception in late 1999, AmeriSciences had no distributors.  Over the subsequent years, AmeriSciences built and grew its distributor network.  This growth was the result of much time, effort and cost.  Distributor growth was achieved through a variety of marketing and recruiting tools ranging from large conferences and dial-in conference meetings to one-on-one meetings and was supported by a multitude of printed and internet-based written materials.  Significant expenses were incurred in the recruitment, motivation and support of AmeriSciences' IMC distributors.  Each IMC was further incentivized to recruit additional distributors.  As further distributors signed on, the growth was akin to a family tree – those at or

near the top of the tree (i.e., the most successful recruiters) might have multiple layers (or generations) below them constituting a "downline" network.  With AmeriSciences, an IMC could earn commissions, bonuses and related compensation based upon product sales by the IMC and by those in its downline network.

43.     A person became an AmeriSciences IMC by entering into an "Independent Marketing Consultant Agreement" (an "IMC Agreement") with AmeriSciences.  A person would not be an IMC without entering into an IMC Agreement.  Pursuant to the IMC Agreement, each IMC, inter alia, agreed to read, understand, adhere to and be bound by AmeriSciences' Policies and Procedures ("P&Ps") and any amended P&Ps instituted by AmeriSciences "to maintain a viable marketing program."   IMC Agreement, Terms and Conditions, at ¶ 8. AmeriSciences' P&Ps required IMCs to "maintain high standards of business ethics when dealing with Consumers, [AmeriSciences] or other [AmeriSciences] IMCs."  P&Ps at § 1.01.

44.     The IMC Agreement and the P&Ps each prohibited the practice of "cross-sponsoring" (also known as "poaching") other IMCs.  "Cross-sponsoring" occurs when an IMC directly or indirectly takes action to recruit or attempt to recruit another IMC to join another network marketing company.  This practice is generally considered unethical and unlawful in the MLM industry at large.

45.     Specifically, the IMC Agreement states:

> IMCs shall not directly or indirectly solicit IMCs of COMPANY [AmeriSciences] into other network marketing organizations during the term of this agreement.  This term will remain in effect for the period of the Agreement and for 1 year thereafter….

IMC Agreement, ¶13.  As is evident, the anti-poaching provision extended for one year beyond the term of the IMC Agreement.

46.     AmeriSciences' P&Ps further state:

12

> During the term of the IMC Agreement and for one (1) year thereafter, an IMC may not sponsor, or attempt to sponsor, another COMPANY IMC or licensee into any other network marketing company. In addition, no IMC may participate in any action that causes another IMC to be sponsored through someone else into another network marketing company in violation of this Section 3.06. Notwithstanding the foregoing, the identity of any IMC, prospective IMC or AmeriSciences customer (other than personally known to the IMC prior to becoming an IMC) is considered confidential information proprietary to AmeriSciences and cannot be used directly or indirectly for any purpose whatsoever outside the normal conduct of an IMC's AmeriSciences business.

47.     The purpose of these provisions, consistent with industry practice, was to protect AmeriSciences' marketing/sales organization and trade secrets, without which AmeriSciences would not be able to exist (and in fact was not able to exist).

48.     The P&Ps also contained the following "Confidentiality Agreement," at section 6.01, wherein each IMC affirmatively agreed that the list of AmeriSciences IMCs, as well as an IMC's downline or genealogy reports constituted proprietary trade secrets of AmeriSciences:

> 6.01   CONFIDENTIALITY AGREEMENT
> During the term of the Agreement, Company may supply to IMC confidential information, including, but not limited to genealogical and Downline reports, customer lists, customer information developed by COMPANY or developed for and on behalf of COMPANY by IMC (including, but not limited to, credit data, customer and IMC profiles and product purchase information), IMC lists, manufacturer and supplier information, business reports, commission or sales reports and such other financial and business information which COMPANY may designate as confidential. All such information ("the Information"), whether in writing or electronic format, is proprietary and confidential to COMPANY and is transmitted to IMCs in strictest confidence on a "need to know" basis for use solely in their business with COMPANY. IMCs must use their best efforts to keep the information confidential and must not disclose any of the Information to any third party, directly or indirectly.

> IMCs must not use the Information to compete with COMPANY or for any purpose other than promoting COMPANY's program and its products and services. Upon expiration, nonrenewal or termination of the Agreement, IMCs must discontinue the use of such confidential information and promptly return any confidential information in their possession to COMPANY.

49.     Throughout its existence, AmeriSciences took various steps to safeguard these valuable trade secrets.  For instance, Barry has already testified under oath that AmeriSciences incorporated the following privacy protections: (i) only Redman and AmeriSciences' IT manager had access to AmeriSciences entire IMC database of information – not even Barry or Louis had unfettered access; (ii) an IMC could not access downline information of other IMCs; (iii) IMCs' access into the AmeriSciences' web and system-based information (which did not include general distributor information) was password protected, and (iv) paper or hard-copy complete IMC information was not available.  On information and belief, AmeriSciences implemented various other methods to protect its trade secrets and other proprietary and confidential information.  Quite simply, AmeriSciences protected, and treated as proprietary and confidential, information regarding its distributors and customers, its distributor network, and related genealogy and downline information.

50.     Upon information, AmeriSciences had a network of over 6,000 IMC distributors at the time of the theft of its information and network in April 2012.

### AmeriSciences' Trade Secrets are Stolen and Delivered to Organo Gold; AmeriSciences' Fiduciaries Abandon AmeriSciences

51.     Apparently, toward the end of 2011 Louis and Barry had become disenchanted with their ability to make riches from the AmeriSciences business.  The consideration of alternatives began.  In early January 2012, Barry and his wife, Kara, attended a large Organo Gold conference in Las Vegas.  Barry and Kara attended as "VIP guests" of, and with expenses

paid by, Organo Gold and Buggs.  Barry met with Buggs and Bernardo Chua, Organo Gold's founder and senior executive, in Las Vegas where the ultimate scheme presumably had its genesis.

52.     The scheme was further developed among Buggs (acting for himself and Organo Gold), Barry and Louis in a series of phone calls and meetings over the next few months. Ultimately, Buggs delivered to Barry an email, dated April 3, 2012, that set forth terms by which Barry, Louis and Organo Gold would accomplish the theft of AmeriSciences distributor network and information and other valuable assets and cause the destruction of AmeriSciences.  A true and correct copy of the April 3, 2012 email (hereinafter, the "Terms of Agreement Email") is attached as Exhibit "A".   As is plainly evident in the Terms of Agreement Email, the negotiations among Buggs, Organo Gold, Barry and Louis centered upon the following:

- Barry and Louis were to "cease the promotion of . . . AmeriSciences and solely promote Organo Gold."

- Barry and Louis would "transfer the existing genealogy from AmeriSciences to Organo Gold."

- Barry and Louis would "provide Organo Gold a current official sales report of [AmeriSciences]."

- Barry and Louis would receive "a sum total of $50,000" per month from Organo Gold for an undetermined period of time with the first payment due by wire transfer "no longer than 5 days after the transfer of Geneology [sic] and the announcement from Barry and Louis to the AmeriSciences field leadership team."

- The existing AmeriSciences' distributor network would transfer into Organo Gold at levels and ranks that corresponded to those at AmeriSciences.

53.    Barry delivered an email reply to Buggs.  In the reply, Barry sought to clarify a few of the minor points but otherwise did not contradict or dispute the essential deal terms.

54.    Throughout the negotiation period it was well-known, public information that Barry and Louis were principals and control persons of AmeriSciences.  For example, Barry's e-mail "signature" (included in e-mails sent to Buggs and Organo Gold) stated that he was the president and chief executive officer of AmeriSciences.  Organo Gold and Buggs knew that Barry and Louis each had a fiduciary position with AmeriSciences at all relevant times.

55.    Shortly after the Terms of Agreement Email and Barry's reply, a definitive deal was struck among Barry, Louis, Organo Gold and Buggs.  On April 10, 2012, Barry and Louis publicly announced their move to Organo Gold in a meeting in Houston that was attended by, among others, the Giammalvas, the Fertigs, the Wascoviches, the Nakagawas, the Sperrys and Krosses (collectively hereinafter referred to as the "IMC Defendants").  The results of this illicit agreement included Louis and Barry leaving AmeriSciences to join Organo Gold, with placement in Buggs' downline network, as high-level distributors (Diamond-Level) with the AmeriSciences' distributor network moving over en masse, essentially intact, to constitute Barry's and Louis's downline.  The deal further included the transfer of AmeriSciences' distributor network, including distributor, genealogy and downline information, to Organo Gold. In fact, on April 19, 2012, Barry received an e-mail from George Skirm, a member of AmeriSciences' IT team, delivering the coveted list of AmeriSciences IMCs, including IMC names, tax identification numbers, home and business addresses, e-mail addresses, business and cellular telephone numbers, usernames, passwords, and status and rank for compensation purposes (collectively, the "List").  Barry then delivered the List to Organo Gold.  Within minutes of the Skirm email to Barry, subsequent communications took place between Organo

16

Gold's IT personnel and Skirm regarding proper formatting of the information to facilitate seamless introduction and incorporation of the List (and its information) into the Organo Gold system.

56.     On information and belief, other valuable assets of AmeriSciences were transferred to and/or acquired by Organo Gold as part of the above-described transaction, including certain WMS Software,[3] a Columbia Distributor License[4] and other assets and information,[5] including the Network Information (defined below) (together with the List, the "AmeriSciences Assets").     The AmeriSciences Assets were transferred without any consideration of any kind paid or provided to AmeriSciences.

57.     Barry, Louis, Organo Gold and Buggs each benefitted from their illicit deal. Barry and Louis were each paid or promised several $100,000s, with subsequent promises of the income enjoyed by high-level Organo Gold distributors.  While it appears that Louis has left Organo Gold, to this day Barry is a "Diamond-Level" Organo Gold distributor – one of the highest and most lucrative levels.  On information and belief, Kara aided and participated in Barry's wrongful acts and received benefit therefrom.  Organo Gold benefited through the acquisition of a large network of new distributors (i.e., sales people and customers) and AmeriSciences' trade secrets and other property without any consideration paid to AmeriSciences.  Buggs also realized personal benefit through the "overnight" addition of over 6,000 new distributors added to his Organo Gold downline.

58.     Following the agreement with Buggs and Organo Gold, Barry and Louis embarked on a "sales mission" to convince AmeriSciences' IMCs to leave AmeriSciences for

---

[3] On information and belief, this was proprietary software created for AmeriSciences by its IT personnel.
[4] On information and belief, the Columbia Distributor License is a license authorizing AmeriSciences' network marketing operations in Columbia.
[5] At this time, Plaintiff is unable to specifically identify each asset that was transferred to or acquired by Organo Gold.  Plaintiff anticipates that other such assets may be determined during the discovery process.

Organo Gold. Beginning at the April 10 meeting, and in multiple subsequent communications, Barry, Louis, Buggs and the IMC Defendants developed, coordinated and implemented the means by which virtually all AmeriSciences IMCs were "poached" to join Organo Gold. The poaching in fact took place via numerous telephone conferences and meetings and "blast out" email messages to lower-level IMCs with many of the communications coming from the IMC Defendants.

59. One of many examples of these communications is reflected at Exhibit "B", attached hereto (the "Fertig Email Invite"). The Fertig Email Invite, addressed to "All Market Leaders," describes Barry's and Louis' efforts to leave AmeriSciences behind and encourages All Market Leaders to join a conference call to be conducted by Barry and Louis. The obvious purpose of this call (and various other similar calls) was to encourage AmeriSciences' IMCs to leave AmeriSciences and join Organo Gold.

60. AmeriSciences received no compensation for any of the foregoing described transfers of the AmeriSciences Assets (collectively, the "Transfers" and each a "Transfer").

61. AmeriSciences was insolvent for several years through and including April of 2012. Specifically, AmeriSciences' balance sheet dated as of April 1, 2012, reflects assets totaling $1,589,228.51 and liabilities totaling $4,121,792.99. Similarly, AmeriSciences' balance sheet dated as of May 1, 2012, reflects assets totaling $1,716,063.01 and liabilities totaling $4,176,867.05. Balance sheet insolvency is plainly evident.[6]

62. Barry, Louis and the IMC Defendants each received a personal benefit as Organo Gold offered these persons the ability to immediately obtain a high-level distributor status in the Organo Gold network. Under the Organo Gold compensation system, high-level distributors are

---

[6] Plaintiff does not concede the accuracy of the asset values reflected in the balance sheets.

allowed a higher percentage commission and bonus payments and a wider variety of earning methods.

63.     Organo Gold benefitted from the Transfers immediately by realizing a vast, rapid expansion of its distributor ranks.  As with any MLM company, more distributors means greater sales and greater profits for the business.  Overnight, Organo Gold gained what might have otherwise taken substantial time and/or cost to build and develop in the ordinary course.

64.     Buggs also received a substantial benefit as a result of the Transfers.  Given that the entire AmeriSciences' network (now in Barry's and Louis's downline) slotted in as part of Buggs' downline, Buggs realized immediate and substantial benefit.  In fact, various internet sites (some of which may be affiliated with Buggs) boast of Buggs' six-figure monthly earnings and multi-millionaire status.

65.     Everyone benefitted from the Transfer except for AmeriSciences, which was destroyed, and AmeriSciences' creditors, resulting in the Bankruptcy Case.

### CLAIMS FOR RELIEF

### COUNT I:
### MISAPPROPRIATION OF TRADE SECRETS
**(Against all Defendants, except LBS and BLS)**

66.     Plaintiff incorporates each and every allegation contained in paragraphs 1 through 65, inclusive, as if fully rewritten herein.

67.     The information that Barry and Louis transferred and caused to be transferred to Organo Gold and Buggs in April of 2012, including but not limited to the List (and information compiled therein), IMC profiles, genealogical and downline reports, customer information and other information detailing the AmeriSciences' business methods and "network" (the "Network

Information") constituted "trade secrets" of AmeriSciences as defined by the laws of the State of Texas.

68.     As shown above, the Network Information derived independent economic value (actual and potential) from not being generally known to, and not being readily ascertainable by proper means by, other MLM or "network marketing" companies.  In particular, the Network Information took years for AmeriSciences to acquire and compile, was surely AmeriSciences' most valuable and indispensable asset, and was the primary driver of AmeriSciences' revenues, and potential profits and growth.

69.     At all relevant times, AmeriSciences took reasonable steps to protect the Network Information through, inter alia, greatly restricted access to the information.  AmeriSciences' P&Ps, published on AmeriSciences' website and incorporated into every IMC Agreement, expressly protected the Network Information and labeled such information "confidential."

70.     The Network Information, as compiled and transferred to Organo Gold and Buggs, was only available to a few executives of AmeriSciences.  AmeriSciences personnel and the IMC Defendants were well aware of the proprietary nature and value of the Network Information.

71.     Organo Gold and Buggs acquired the Network Information through improper means, or in breach of an express or implied duty of confidence, or with knowledge that the Network Information was improperly obtained or impermissibly disclosed.  In negotiating with Barry and Louis, and ultimately paying and/or promising Barry and Louis substantial sums of money, Organo Gold and Buggs actively encouraged Barry's and Louis's (i) theft of AmeriSciences' property and (ii) breach of fiduciary duty.  Organo Gold and Buggs never paid one penny of consideration to AmeriSciences for the transfer of AmeriSciences' valuable assets.

72.     Additionally, Organo Gold and Buggs knew or should have known and may be charged with knowledge that Network Information transferred by the IMC Defendants was transferred and received through improper means, or in breach of an express or implied duty of confidence, or with knowledge that such Network Information was improperly obtained or impermissibly disclosed.   Each IMC Defendant was bound by the various protections and restrictions in the IMC Agreement and the P&Ps.   Such protections and restrictions are normal and customary in the MLM industry.   In fact, Organo Gold's <u>own</u> Policies and Procedures (incorporated by reference into each Organo Gold distributorship agreement) classifies "cross-sponsoring and recruiting" as prohibited "deceptive, unlawful, or unethical business or recruiting practices." Organo Gold's <u>own</u> Policies and Procedures also state that "Distributor information including: names, addresses, email addresses and telephone numbers of other distributors, are the Company's proprietary trade secret information."

73.     Organo Gold and Buggs have used and benefitted from the Network Information. Such use includes the substantial increase in Organo Gold distributors, placed within Buggs' downline, to provide an immediate increase in Organo Gold sales and profits and Buggs' downline-generated income.   These "new" distributors were also required to immediately buy a substantial amount of Organo Gold product to guarantee continued rank and status.

74.     Barry, Louis and the IMC Defendants, acting individually and in concert with others, disclosed and delivered the Network Information to Organo Gold and Buggs.   Organo Gold and Buggs, acting individually and in concert with others, acquired, have used and continue to use the Network Information for competitive advantage and/or economic gain.   Each and all of these acts by the Defendants constitute acts of misappropriation of the trade secrets of AmeriSciences under applicable law.

75.     After misappropriating the Network Information, Organo Gold, Buggs, the Cocheus and Gallardo used this information to solicit IMCs en masse, unlawfully and tortiously interfering with AmeriSciences' valuable relationships with its IMCs.  The IMC Defendants, in turn, used the misappropriated Network Information for financial gain.

76.     As a direct and proximate result of such Defendants' actions described hereinabove, these Defendants were unjustly enriched, and AmeriSciences sustained substantial economic losses in an amount to be proven at trial.

77.     Under the foregoing circumstances, such Defendants' misappropriation was willful and malicious, entitling Plaintiff to exemplary and/or punitive damages under applicable law.

**COUNT II:**
**CONVERSION**
**(Against all Defendants, except LBS and BLS)**

78.     Plaintiff incorporates each and every allegation contained in paragraphs 1 through 77, inclusive, as if fully rewritten herein.

79.     AmeriSciences, at all relevant times, was the owner of the AmeriSciences Assets (including the List and Network Information), and was entitled to exercise exclusive possession and control of the AmeriSciences Assets as valuable and essential assets to AmeriSciences' business.

80.     Each of the above-named Defendants, individually and acting in concert with others, wrongly exercised dominion or control over the AmeriSciences Assets and/or components thereof in order to facilitate and cause the illicit transfer of the AmeriSciences Assets to Organo Gold and Buggs.  On information and belief, the Defendants to whom this

conversion count is applicable to this day continue to wrongly possess, use and control some or all of the AmeriSciences Assets.

81.     As a direct and proximate result of the above-named Defendants' unlawful conversion of the AmeriSciences Assets, AmeriSciences has suffered actual damages in an amount to be proven at trial.

82.     The actions of the above-named Defendants were willful and malicious and showed a wanton disregard for the rights of AmeriSciences.  Therefore, in addition to any other relief, Plaintiff is entitled to recover punitive and exemplary damages.

**COUNT III:**
**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**
**(Against All Defendants. Except LBS and BLS)**

83.     Plaintiff incorporates each and every allegation contained in paragraphs 1 through 80, inclusive, as if fully rewritten herein.

84.     Each and every AmeriSciences' IMC, as a pre-condition to becoming an IMC, entered into an IMC Agreement with AmeriSciences, thereby becoming bound to the terms and conditions of the IMC Agreement and the P&Ps.  At all times, AmeriSciences and its IMCs were contractually bound by the IMC Agreement and the P&Ps.

85.     At all times relevant to this Complaint, each of the above-named Defendants knew (or should have known) of the existence of the IMC Agreements and the P&Ps and the nature of the contractual relationship between AmeriSciences and its IMCs.  For any MLM, the "distributorship agreement" is a necessary component of the structural business model.  Gallardo and the Cocheus each had first-hand knowledge of the IMC Agreements by virtue of their insider status and/or positions with AmeriSciences.  Each IMC Defendant, as a party to an IMC Agreement, knew the terms of the IMC Agreement and the P&Ps, and knew that each and every

IMC was in such a contractual relationship with AmeriSciences.  Finally, Organo Gold and Buggs, possessing detailed knowledge of customary MLM distributor relationships, surely knew or had knowledge that AmeriSciences' IMCs were contractually-bound to AmeriSciences.

86.     By acts and omissions that include, without limitation, those set forth above, each above-named Defendant interfered with, and encouraged breaches of, the existing IMC Agreements.  These acts and omissions include, without limitation, multiple conference calls, meetings and other communications wherein Buggs (individually and as an Organo Gold representative), Barry and Louis solicited, encouraged and persuaded the IMC Defendants and other AmeriSciences' distributors to (i) breach their own IMC Agreements, and (ii) further encourage "downline" IMCs to breach their IMC Agreements.  Additionally, each of the above-named Defendants, individually and acting in concert with others, participated in conference calls, meetings and other communications with downline IMCs to encourage their breaches.  Each above-named Defendant benefitted or sought benefit from each IMC Agreement breached by an IMC.

87.     AmeriSciences reasonably expected and relied upon the protections and restrictions contained in the IMC Agreements and the P&Ps, in particular the anti-poaching and confidentiality provisions, in order to maintain its distributor network and avoid en masse movement or departure of IMCs.  Such expectations are customary and normal.  The above-named Defendants' interference, inter alia, deprived AmeriSciences of its operating lifeblood and of a valuable, marketable asset.

88.     As a direct and proximate result of the interference of the above-named Defendants, AmeriSciences has been damaged in amount to be proven at trial.

89.     The actions of the above-named Defendants were willful and malicious and showed a wanton disregard for the rights of AmeriSciences.  Therefore, in addition to any other relief, Plaintiff is entitled to recover punitive and exemplary damages.

## COUNT IV:
## BREACH OF FIDUCIARY DUTY
### (Against Barry and Louis)

90.     Plaintiff incorporates each and every one of the allegations contained in paragraphs 1 through 87, inclusive as if fully rewritten herein.

91.     By reason of their positions and the trust AmeriSciences reposed in Barry and Louis, they owed fiduciary duties to AmeriSciences.  Barry, upon information and belief, was (i) a co-founder, substantial limited partner, president and chief executive officer of AmeriSciences and (ii) a co-founder, 40% equity owner, director and officer of General Partner.  Barry exercised a high level of control over virtually all aspects of AmeriSciences' business and financial operations.

92.     Similarly, Louis was a substantial limited partner, executive officer and controlling person of AmeriSciences, and an officer, director and 40% owner of General Partner. Louis exercised a high level of control over virtually all aspects of AmeriSciences' business and financial operations.

93.     As officers, directors and control persons of AmeriSciences and General Partner, Barry and Louis owed AmeriSciences a fiduciary duty of care to exercise reasonable care, skill and diligence in fulfilling their responsibilities.

94.     Barry and Louis also owed AmeriSciences a duty of loyalty and to refrain from self-dealing, conflicts of interest, usurpation of partnership opportunity, and competition.

95.     Barry and Louis also owed AmeriSciences a duty of good faith and candor, which includes an obligation of fairness and honesty in their dealings with AmeriSciences or matters pertaining to AmeriSciences.

96.     Once AmeriSciences entered into the zone of insolvency, Barry and Louis owed these fiduciary duties to both AmeriSciences and its creditors to pay, satisfy, or discharge all of debts, liabilities and obligations from the assets of AmeriSciences or make adequate provision for the payment, satisfaction or discharge of the obligations in a just and equitable fashion.

97.     By the actions and omissions described above, including but not limited to coordinating, directing and participating in the en masse departure of AmeriSciences' distributor network to cripple AmeriSciences, misappropriating AmeriSciences' Network Information, transferring AmeriSciences' assets for no consideration, interfering with the IMC Agreements, and ultimately abandoning AmeriSciences with minimal assets and no ability to operate the business, all at considerable personal financial gain, Barry and Louis breached the fiduciary duties that they each owed to AmeriSciences.

98.     As a direct and proximate result of Barry and Louis' breaches of fiduciary duties, AmeriSciences has been damaged in amount to be proven at trial.

99.     The actions of Barry and Louis were intentional, willful and malicious and showed a wanton disregard for the rights of AmeriSciences.  Therefore, in addition to any other relief, Plaintiff is entitled to recover punitive and exemplary damages for the breaches of fiduciary duty.

## COUNT V:
## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (Against Organo Gold, Buggs and the IMC Defendants)

100.　Plaintiff incorporates each and every one of the allegations contained in paragraphs 1 through 99 as if fully rewritten herein.

101.　By the actions and omissions described above, Barry and Louis breached their fiduciary duties to AmeriSciences.

102.　Organo Gold, Buggs and each IMC Defendant was aware of each of the fiduciary status and position of Barry and Louis with respect to AmeriSciences.

103.　Organo Gold, Buggs and each IMC Defendant willfully, and with wanton disregard for the rights of AmeriSciences, participated in Barry's and Louis' breaches of fiduciary duties by the acts and omissions that include those set forth above.  Those acts and omissions include, but are not limited to, soliciting Barry and Louis to abandon AmeriSciences, conspiring with Barry and Louis to transfer the Network Information to Organo Gold, and conspiring and acting in concert with Barry and Louis to coordinate, assist and/or implement the en masse movement of the AmeriSciences distributor network to Organo Gold, and interfering with the IMC Agreements as set forth above.  Additionally, Organo Gold and Buggs enticed Barry and Louis with personal financial benefit in order to further aid, abet and encourage Barry and Louis to breach their duties.

104.　As a direct and proximate result of the breaches of fiduciary duties and encouragement of same, AmeriSciences has been damaged in amount to be proven at trial.

105.　The actions of Organo Gold, Buggs and each IMC Defendant were willful and malicious and showed a wanton disregard for the rights of AmeriSciences.  Therefore, in addition to any other relief, Plaintiff is entitled to recover punitive and exemplary damages.

## COUNT VI:
## UNJUST ENRICHMENT
### (Against Organo Gold, Buggs, Gallardo, BHF and John Does 6-10)

106.    Plaintiff incorporates each and every allegation contained in paragraphs 1 through 105, inclusive, as if fully rewritten herein.

107.    The above-named Defendants have been unjustly enriched as a result of their misappropriation of the AmeriSciences Assets, and by the wrongful conduct alleged above.  It would be unjust for such Defendants to retain any value they obtained as a result of their wrongful conduct.

108.    Accordingly, Plaintiff is entitled to recover, for the benefit of AmeriSciences' bankruptcy estate, a full restitution of all amounts that the above-named Defendants have been unjustly enriched at AmeriSciences' expense.

## COUNT VII:
## AVOIDANCE OF FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(a)(1)(A)
### (Against Organo Gold and Buggs)
### (Actual Fraud)

109.    Plaintiff incorporates each and every allegation contained in paragraphs 1 through 108, inclusive, as if fully rewritten herein.

110.    The Transfers of the AmeriSciences Assets were transfers of an interest of AmeriSciences in property made to and/or for the benefit of Organo Gold and/or Buggs.

111.    Each of the Transfers occurred in or around April 2012, and was within two years of the Involuntary Petition Date.

112.    The facts and circumstances set forth throughout this Complaint reflect that the Transfers were made with actual intent to hinder, delay or defraud AmeriSciences' then and/or future creditors.  In particular, such Transfers were (i) of substantially all of AmeriSciences'

28

assets, (ii) for no value given in return to AmeriSciences ,(iii) made while AmeriSciences was insolvent, and (iv) to or for the benefit of insiders.

113.   The Transfers therefore constitute fraudulent transfers under 11 U.S.C. § 548(a)(1)(A) and Plaintiff is entitled to avoid each of the Transfers.

<u>**COUNT VIII:**</u>
<u>**AVOIDANCE OF FRAUDULENT TRANSFER UNDER 11 U.S.C. § 548(a)(1)(A)**</u>
**(Against Organo Gold and Buggs)**
**(Constructive Fraud)**

114.   Plaintiff incorporates each and every allegation contained in paragraphs 1 through 113, inclusive, as if fully rewritten herein.

115.   The AmeriSciences Assets, including the Network Information, constituted the essential assets of AmeriSciences' business, and the most valuable assets that AmeriSciences owned.  In exchange for the Transfers, AmeriSciences received no value whatsoever.   Thus, AmeriSciences received less than reasonably equivalent value in exchange for the Transfers of the AmeriSciences Assets.

116.   As shown above, AmeriSciences was either insolvent on the date of each Transfer, or became insolvent as a result of the same.  The Network Information, in particular, was critical to generating new revenues and profits through sales.   The Transfers left AmeriSciences with minimal remaining assets, no ability to continue its normal business operations, and no ability to satisfy its unpaid liabilities.

117.   The Transfers therefore constitute fraudulent transfers under 11 U.S.C. §548(a)(1)(B) and Plaintiff is entitled to avoid each of the Transfers.

## COUNT IX
## FRAUDULENT TRANSFER UNDER 11 U.S.C. § 544(b) AND
## TEXAS UFTA §§ 24.005 and/or 24.006
### (Against Organo Gold and Buggs)

118.     Plaintiff incorporates each and every allegation contained in paragraphs 1 through 117, inclusive, as if fully rewritten herein.

119.     Based upon the facts alleged herein, the Transfers were made with actual intent to hinder, delay or defraud one or more then-existing or future creditors of AmeriSciences.

120.     Additionally and/or alternatively, AmeriSciences did not receive reasonably equivalent value in exchange for the Transfers and at that time AmeriSciences was engaged in a business for which its remaining assets were unreasonably small in relation to the business. Simply, AmeriSciences could not continue to engage in its business without the AmeriSciences Assets.

121.     Additionally and/or alternatively, AmeriSciences did not receive reasonably equivalent value in exchange for the Transfers.

122.     AmeriSciences was either: (1) insolvent on the date of each Transfer; or (2) became insolvent as a result of the same.

123.     The Transfers therefore constitute fraudulent transfers under 11 U.S.C. § 544(b) and Sections 24.005 and 24.006 of Title 3, Chapter 24 of the Texas Business and Commerce Code ("Texas UFTA"), and are avoidable by the Plaintiff.

## COUNT X
## RECOVERY OF THE VALUE OF THE TRANSFERS UNDER 11 U.S.C. § 550
### (Against Organo Gold, Buggs, Gallardo, BHF and John Does 6-10)

124.     Plaintiff incorporates each and every allegation contained in paragraphs 1 through 122, inclusive, as if fully rewritten herein.

30

125.    The Transfers are avoidable under chapter 5 of the Bankruptcy Code as set forth herein.

126.    As shown above, Barry and Louis caused AmeriSciences to transfer the AmeriSciences Assets directly to Organo Gold and Buggs who paid no value in exchange for such AmeriSciences Assets.

127.    A return of the AmeriSciences Assets alone would not adequately compensate the bankruptcy estate because (i) the AmeriSciences Assets derived value to AmeriSciences through their secrecy and (ii) AmeriSciences was irreversibly destroyed as a result of the Transfers. Under 11 U.S.C. § 550(a), Plaintiff is entitled to an order of recovery for the value of each Transfer on the date that such Transfer was made to Organo Gold and Buggs.

**COUNT XII:**
**BREACH OF CONTRACT**
**(Against IMC Defendants)**

128.    Plaintiff incorporates each and every allegation contained in paragraphs 1 through 127, inclusive, as if fully rewritten herein.

129.    Each IMC Defendant was party to, and bound by, an IMC Agreement with AmeriSciences.

130.    The P&Ps, which are incorporated by reference into each IMC Agreement, prohibit the practice of "poaching" or "cross-soliciting" IMCs and contained strict confidentiality provisions for proprietary and trade secret information including IMC lists and genealogy and downline reports.

131.    By the acts and omissions described above, including but not limited to transferring certain Network Information to Organo Gold and soliciting existing IMCs to join Organo Gold, each IMC Defendant breached its IMC Agreement with AmeriSciences.

132.    As a direct and proximate result of the IMC Defendants' breaches of the IMC

Agreements, AmeriSciences has been damaged in amount to be proven at trial.

### COUNT XIII:
### EMBEZZLEMENT AND/OR DEFALCATION IN A FIDUCIARY CAPACITY AND/OR BREACH OF FIDUCIARY DUTY
#### (Against Barry and Louis)

133.    Plaintiff incorporates each and every allegation contained in paragraphs 1 through

132, inclusive, as if fully rewritten herein.

134.    Throughout the entirety of AmeriSciences' existence as an operating business, it

is apparent that Barry and Louis ignored or obfuscated any distinctions between AmeriSciences'

funds and proper expenses and liabilities, on the one hand, and their own personal/family funds

and expenses, on the other hand.  Simply, it appears that Barry and Louis treated AmeriSciences

as their personal piggy-bank, using AmeriSciences' funds to pay personal expenses and

otherwise support lavish lifestyles.

135.    Quite simply, AmeriSciences had no apparent controls (or at best, woefully

deficient controls) regarding the company's reimbursements of expenses to Barry and Louis

(including their family members, affiliates and alter egos).   As to certain other non-

AmeriSciences expenses, Barry and Louis simply caused AmeriSciences to directly pay items.

One such issue that has been uncovered by the Plaintiff relates to a parcel of undeveloped real

property located in Houston, Texas (the "Park 10 Property").  The Park 10 Property was initially

to have been owned and paid for by AmeriSciences.  Unfortunately for AmeriSciences, Barry,

Louis and Redman instead placed ownership of the Park 10 Property in a separate entity, LBS,

that the three individuals owned, yet caused AmeriSciences to pay the purchase price (including

monthly mortgage payments to the mortgage lender), maintenance costs, and ad valorem taxes.

136.    Plaintiff has examined AmeriSciences books and records, including bank account statements, in order to identify payments and/or transfers by AmeriSciences to or for the benefit of Barry and/or Louis (including their family members, affiliates and/or alter egos).  Attached as Exhibit "C" is a list of each such payments and/or transfers that appear to have been incurred solely for the benefit of the Barry and/or Louis and their respective families and related entities (the "Insider Improper Payment List").  Plaintiff has discovered multiple additional transfers (including luxury and/or exorbitant hotel charges and meals/entertainment charges) that appear questionable or are not sufficiently specific so as to allow Plaintiff to determine their legitimacy. Plaintiff reserves the right to amend and supplement the Insider Improper Payment List during the discovery process.

137.    As set forth above, as officers, directors and control persons of AmeriSciences and General Partner, Barry and Louis owed AmeriSciences a fiduciary duty of care to exercise reasonable care, skill and diligence in fulfilling their responsibilities.

138.    Barry and Louis also owed AmeriSciences a duty of good faith and candor, which includes an obligation of fairness and honesty in their dealings with AmeriSciences or matters pertaining to AmeriSciences.

139.    Barry and Louis caused AmeriSciences to fund (or be obligated for) their own personal lifestyle and various expenses that appear to have been incurred primarily for the benefit of the Barry and/or Louis and their respective families and related entities. By mismanaging and misappropriating Amerisciences' corporate assets in this manner, Barry and Louis committed defalcations and breaches of fiduciary duties.

140.    As a direct and proximate result of Barry and Louis' breaches of fiduciary duties, AmeriSciences has been damaged in amount to be proven at trial.

**COUNT XIV:**
**FRAUDULENT TRANSFER UNDER 11 U.S.C. § 544(b) AND**
**TEXAS UFTA § 24.005 and/or § 24.006**
**(Against Gallardo, BLS, LBS, BHF and John Does 6-10)**

141.    Plaintiff incorporates every allegation contained in paragraphs 1 through 140, inclusive, as if fully rewritten herein.

142.    As set forth above, AmeriSciences' controlling persons caused AmeriSciences to fund (or be obligated for) various expenses that appear to have had no AmeriSciences' business purpose but were instead incurred primarily for the personal benefit of the Cocheus and/or Gallardo and the benefit of various other parties and related entities, including CSF, BHF, BLS, and LBS. AmeriSciences recived no (or very little) apparent value or consideration in exchange for such transfers and obligations, and thus, AmeriSciences received less than reasonably equivalent value in exchange.

143.    Plaintiff has examined AmeriSciences books and records, including bank account statements, in order to identify payments and/or transfers by AmeriSciences to or for the benefit of the Defendants named in this Count.[7]  Attached as Exhibit "D" is a list of each such transfer made within the four (4) years prior to the Involuntary Petition Date and for which AmeriSciences received less than reasonably equivalent value in return (the "Fraudulent Payment List").  Plaintiff has identified additional unexplained transfers that appear to be of questionable validity, and accordingly, Plaintiff reserves the right to amend and supplement the Fraudulent Payment List during the discovery process (collectively, such payments as amended and supplemented are the "Four-Year Fraudulent Payments").

144.    AmeriSciences was insolvent at all times from and after October 1, 2008. Specifically, each and every month-end AmeriSciences' balance sheet from October 2008 to

---

[7] In light of the Cocheu bankruptcy case and events therein, this Count does not seek recovery from Barry or Kara.

May 2012 (following the cessation of AmeriSciences' normal business operations) reflects a substantial negative equity value.

145.     Each Four-Year Fraudulent Payment therefore constitutes a fraudulent transfer under 11 U.S.C. § 544(b) and Section 24.005 and/or Section 24.006 of the Texas UFTA, and is avoidable by the Plaintiff.

**COUNT XV:**
**AVOIDANCE OF FRAUDULENT TRANSFERS UNDER 11 U.S.C. § 548**
**(Against Gallardo, BLS, LBS, BHF and John Does 6-10)**

146.     Plaintiff incorporates each and allegation contained in paragraphs 1 through 145, inclusive, as if fully rewritten herein.

147.     Plaintiff has examined AmeriSciences books and records, including bank account statements, in order to identify payments and/or transfers by AmeriSciences to or for the benefit of the Defendants named in this Count.[8]  Attached as Exhibit "E" is a list of each such transfer made within the two (2) years prior to the Involuntary Petition Date and for which AmeriSciences received less than reasonably equivalent value in return (the "Two-Year Fraudulent Payment List").  Plaintiff has identified additional unexplained transfers that appear to be of questionable validity, and accordingly, Plaintiff reserves the right to amend and supplement the Two-Year Fraudulent Payment List during the discovery process (collectively, such payments as amended and supplemented are the "Two-Year Fraudulent Payments").

148.     As set forth on the Two-Year Fraudulent Payment List, in the two-year period prior to the Involuntary Petition Date, Barry and Louis caused AmeriSciences to fund (or be obligated for) various expenses that appear to have had no AmeriSciences' business purpose but were instead incurred primarily for the personal benefit of the Cocheus and/or Gallardo and the benefit of various other parties and related entities, including CSF, BHF, BLS, and LBS.

---

[8] In light of the Cocheu bankruptcy case and events therein, this Count does not seek recovery from Barry or Kara.

AmeriSciences recieved no (or very little) apparent value or consideration in exchange for such transfers and obligations.  Thus, AmeriSciences received less than reasonably equivalent value in exchange for the Two-Year Fraudulent Payments.

149.    As shown above, AmeriSciences was either insolvent on the date of each Two-Year Fraudulent Payment, or became insolvent as a result of the same.

150.    The Two-Year Fraudulent Payments therefore constitute fraudulent transfers under 11 U.S.C. § 548 and Plaintiff is entitled to avoid each of such Two-Year Fraudulent Payments.[9]

**COUNT XVI:**
**AVOIDANCE OF PREFERENTIAL PAYMENTS**
**UNDER 11 U.S.C. § 547**
**(Against BLS)**

151.    Plaintiff incorporates each and every allegation contained in paragraphs 1 through 149, inclusive, as if fully rewritten herein.

152.    As detailed throughout this Complaint, at all relevant times, each of Louis, CSF, BLS and BHF was an "insider" of AmeriSciences as that term is defined in 11 U.S.C. § 101(31).

153.    Plaintiff has examined AmeriSciences books and records, including bank account statements, in order to identify payments and/or transfers by AmeriSciences to or for the benefit of Louis, CSF, BLS and BHF (including family members, affiliates and/or alter egos).  Attached as Exhibit "F" is a list of certain payments and/or transfers made to BLS.[10]  On information and belief, BLS typically was the entity owed and actually received payments from AmeriSciences on account of services provided by, and compensation due to, Barry, Louis, Redman, and/or their affiliates.  Accordingly, on information and belief the BLS payments reflected on Exhibit "F"

---

[9] In light of the Cocheu Bankruptcy Case and events therein, this Count does not seek recovery from Barry or Kara.

[10] Plaintiff has identified various other transfers relating to the insiders; however, Plaintiff has yet to determine whether such transfers were preferential.  Accordingly, Plaintiff reserves the right to amend Exhibit "F" to include additional insider preference payments.

were payments made on account of an antecedent debt to or for the benefit of each of Louis, CSF, BLS and BHF (including family members, affiliates and/or alter egos) within the one (1) year prior to the Involuntary Petition Date (the "Insider Preference List").[11]

154.    The payments reflected on the Insider Preference List and any additional payments added through amendment or supplement are collectively referred to as the "Insider Preference Payments").

155.    The Insider Preference Payments were transfers of an interest of AmeriSciences in property, directly to or for the benefit of BLS and its affiliates (Barry, Louis, and their affiliates).

156.    At the time of each Insider Preference Payment, BLS or the relevant insider was a creditor of AmeriSciences by virtue of certain expenses incurred and services performed on behalf of AmeriSciences, accordingly creating an antecedent debt.

157.    The Insider Preference Payments were made for or on account of such antecedent debts owed to BLS or the relevant insider before such Insider Preference Payments were made.

158.    AmeriSciences was insolvent at the time of each Insider Preference Payment.

159.    Upon information and belief, BLS (including any relevant insider) does not have an allowable claim, and has received a greater recovery on account of its Insider Preference Payments than it would receive in a hypothetical case under Chapter 7.

160.    Based on the foregoing, the Insider Payments constitute avoidable preferential transfers under 11 U.S.C. § 547(b), and Plaintiff seeks judgment accordingly.

---

[11] In light of the Cocheu Bankruptcy Case and events therein, this Count does not seek recovery from Barry or Kara.

**COUNT XVII:**
**RECOVERY OF AVOIDABLE TRANSFERS**
**UNDER 11 U.S.C. § 550**
**(Against Gallardo, BLS, LBS, BHF and John Does 6-10)**

161.     Plaintiff incorporates each and every allegation contained in paragraphs 1 through 158, inclusive as if fully rewritten herein.

162.     The Fraudulent Payments, Four-Year, Two-Year Fraudulent Payments and/or Insider Preference Payments are avoidable under chapter 5 of the Bankruptcy Code.

163.     As set forth above, the Fraudulent Payments, Two-Year Fraudulent Payments and/or Insider Preference Payments were made directly or indirectly to and/or for the benefit of one or more of the above-named Defendants.

164.     Under section 550(a) of the Bankruptcy Code, Plaintiff is entitled to recover from Louis the value of the Fraudulent Payments, Two-Year Fraudulent Payments and/or Insider Preference Payments from the above-named Defendants.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment as follows:

1.   For an award of joint and several, general and special damages in an amount to be proven at trial;

2.   For punitive and exemplary damages;

3.   For an accounting, disgorgement and/or reimbursement of all profits, fees, royalties and pecuniary gain improperly diverted away from AmeriSciences by Defendants;

4.   For avoidance of the Transfers and the recovery of the value of the Transfers from Barry, Louis, Organo Gold and Buggs;

5.   For avoidance of the Fraudulent Payments, Two-Year Fraudulent Payments and/or Insider Preference Payments and recovery of the value of the Fraudulent Payments,

Two-Year Fraudulent Payments and/or Insider Payments from the immediate or mediate transferee or beneficiary;

6.  For attorneys' fees and costs;

7.  For prejudgment interest;

8.  For such other relief as the Court deems just and appropriate.

### DEMAND FOR JURY TRIAL

Plaintiff respectfully demands a jury trial for all issues so triable.

Date:  November 4, 2014                    Respectfully submitted,

                                          */s/John J. Sparacino*
                                          John J. Sparacino, Esq.
                                          Texas State Bar No. 188873700
                                          Federal I.D. No. 12551
                                          Vorys, Sater, Seymour and Pease LLP
                                          700 Louisiana Street, Suite 4100
                                          Houston, Texas 77002
                                          Telephone: (713) 588-7038
                                          Facsimile:  (713) 588-7080
                                          E-mail:  jjsparacino@vorys.com

                                          *Counsel to Plaintiff, the Chapter 11 Trustee*

39